UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

| | | |
|---|---|---|
| GLADYBELD RODRIGUEZ and | ) | CIVIL ACTION NO. |
| GLADYS QUIRINDONGO | ) | |
|     Plaintiffs | ) | |
| | ) | |
| V. | ) | |
| | ) | TRIAL BY JURY DEMANDED |
| NAPOLI MOTORS, INC. d/b/a NAPOLI | ) | |
| NISSAN and NISSAN MOTOR | ) | |
| ACCEPTANCE CORPORATION | ) | |
|     Defendants | ) | OCTOBER 17, 2017 |
| _____) | | |

## COMPLAINT

### I.  INTRODUCTION

1.      This is a suit brought by two consumers under the Consumer Leasing Act

("CLA"), 15 U.S.C. § 1667 *et seq.* and the Magnuson-Moss Warranty Act ("MMWA"), 15

U.S.C. § 2301 *et seq.,* against defendant Napoli Motors, Inc. d/b/a Napoli Nissan

("Napoli Motors").  Plaintiff also asserts pendent state law claims for violation of the

Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.*

and for fraud. Nissan Motor Acceptance Corp. ("NMAC") is named as a defendant as

the assignee of a lease agreement.

### II.  PARTIES

1.      Gladybeld Rodriguez ("Rodriguez") is a consumer who lives in Waterbury,

Connecticut.

2.      Gladys Quirindongo ("Quirindongo") is a consumer who lives in

Waterbury, Connecticut, and she is Rodriguez's mother.

3.      Napoli Motors is a Connecticut corporation that operates a car dealership in Milford, Connecticut.

4.      NMAC is a California corporation that accepts assignment of retail installment contracts from Nissan dealerships such as Napoli Motors.

### III. JURISDICTION

5.      Jurisdiction in this court is proper pursuant to 15 U.S.C. § 1667d(c), 15 U.S.C. § 2310(d)(1)(B),  and Fed. R. Civ. P. 18(a).

6.      This Court has jurisdiction over Napoli Motors because it is organized under the laws of the state of Connecticut and it is located in Connecticut.

7.      This Court has jurisdiction over NMAC because it regularly conducts business in this state.

8.      Venue in this Court is proper because the transaction alleged herein occurred in this state.

### IV. FACTUAL ALLEGATIONS

9.      On or about January 16, 2017, Rodriguez purchased a 2012 Kia Soul (the "Kia") from Napoli Motors pursuant to a Retail Installment Contract.

10.      Quirindongo had co-signed on the Contract and was listed as the Co-Buyer on the Retail Installment Contract.

11.      Rodriguez paid a down payment of $1,500 for the Kia.

12.      The Kia was sold with an express, written warranty that provided:  "THIS MOTOR VEHICLE IS GUARANTEED FOR 60 days or 3,000 miles whichever comes first.  The dealer will pay 100% of the labor and 100% of the parts for the covered

systems, which renders the vehicle mechanically operational and sound during the warranty period."

13.    Napoli Motors also provided Rodriguez with a Buyer's Guide in connection with the sale of the Kia that provided, "The dealership warranties this vehicle to be mechanically operational and sound 60 Days or 3,000 miles."

14.    The Buyer's Guide for the Kia also provided that the system and parts listed in the Buyer's Guide were guaranteed by a limited warranty of 60 days or 3,000 miles, whichever occurs first; and the list of covered parts included "Brakes Master/Wheel Cylinders, Assist Booster, Calipers, and Proportioning Valve."

15.    Rodriguez experienced problems with the Kia's brakes immediately after purchase, and she brought the Kia back to Napoli Motors for repairs, complaining of the brakes squealing and the steering wheel shaking when brakes were applied.  Napoli Motors told her there was nothing wrong with the brakes.  Napoli Motors failed to provide Plaintiffs with an invoice or receipt for this service.

16.    Rodriguez continued to experience problems with the brakes squealing and the steering wheel shaking while applying the brakes, and in March, 2017, while trying to stop at a stop sign, the brakes failed and Rodriguez was unable to stop.

17.    Rodriguez brought the Kia back to Napoli Motors for repairs on or about March 15, 2017.  Jose Segui, a service advisor at Napoli Motors, told Rodriguez that the reason she could not stop was because there was ice build-up between the brake caliper and rims of the tires, but that the brakes were good.

18.	This was a false statement, because the front and rear brake pads and the rear brake rotors required replacement and the front brake rotors needed to be resurfaced.

19.	Rodriguez asked Jose to replace the brakes, but Napoli Motors refused to do so, telling Rodriguez that the brakes were fine and there were no repairs that could be made.

20.	Rather than repair the defective brakes as it was obligated to do under written and express warranty, Jose instead turned Rodriguez over to a salesman, Ricky Mills, who proceeded to persuade her that she should trade-in the Kia for another vehicle.

21.	Mills showed Rodriguez a new 2017 Nissan Sentra (the "Nissan") and told her that she could have the Nissan, but it would have to be leased.

22.	Rodriguez felt unsafe driving the Kia, and she felt that she had no choice except to lease the Nissan.

23.	Napoli Motors "targeted" Rodriguez, who is a young, teenaged woman, and Quirindongo, who is Spanish and does not speak English, because they were perceived to be vulnerable consumers, in part, because of her age and ethnicity.

24.	The Nissan had a Monroney Sticker on the windshield that listed a manufacturer's suggested retail price of $19,315, and Rodriguez asked Mills if that was the price for the Nissan, and he responded that this was the price for the Nissan.

25.	Rodriguez told Mills that she could not afford a monthly payment of more than $350, and Mills told her that her payments would not exceed that amount.

4

26.     Based on Napoli Motor's representations that the price of the Nissan was $19,315 and her monthly lease payments would not exceed $350, Rodriguez agreed to lease the Nissan.

27.     Napoli Motors told Rodriguez that she would need Quirindongo to co-sign for the lease.

28.     Napoli Motors prepared a Lease Agreement that listed Quirindongo as the primary Lessee and Rodriguez as the co-Lessee.

29.     The Lease Agreement listed an agreed upon value of the Nissan of $23,788.12, an amount that was $4,473.12 more than the sticker price that Rodriguez had been told was the price of the Nissan, and this "value" was incorporated into the Gross Capitalized Cost of $26,382.12.

30.     The Lease Agreement listed an amount to be paid in cash of $1,477.56, even though Plaintiffs did not pay any cash to Napoli Motors and were not requested to make any initial cash payment.

31.     Unbeknownst to Plaintiffs, the Lease Agreement also included a charge of $1,999.00 for a service contract that Plaintiffs neither requested nor desired.

32.     Mills turned Plaintiffs over to Brendan, a finance manager, to execute contract documents. The documents were electronic, and Brendan kept the computer monitor turned towards him preventing Plaintiffs from viewing the documents. Consequently, Plaintiffs never saw the lease terms and did not realize that Quirindongo was named as the primary lessee and they did not see the lease payments or the cost of the Nissan.

33.    The Lease Agreement was not provided to Plaintiffs in hard copy until after consummation of the agreement.

34.    After Quirindongo signed the lease agreement and other paperwork, Rodriguez asked Brendan the amount of the monthly payment, and Brendan told her that the payment was $450.00 per month.

35.    This was a false statement because the payments under the Lease Agreement were $499.70, and Rodriguez only learned of this afterwards when she made payment arrangements with NMAC.

36.    The Kia was included in the transaction as a trade-in.

37.    In order to induce NMAC into approving the acceptance of assignment of the lease, Napoli Motors engaged in credit application fraud by providing false information to NMAC regarding Plaintiffs' income.

38.    On that same day, Napoli Motors performed the necessary repair work to the brakes that it falsely told Rodriguez was not required, replacing the front and rear brake pads and the rear rotors and resurfaced the rear brake rotors.

39.    On June 14, 2017, Plaintiffs returned the Nissan to Napoli Motors and, the following day, they notified Napoli Motors and NMAC that they had elected to rescind the transaction due to the fraud by Napoli Motors.

V.  CAUSES OF ACTION

A.  CONSUMER LEASING ACT

40.    Napoli Motors violated the CLA as follows:

    a. It falsely disclosed an initial cash payment of $1,477.56 in the Lease agreement for the Nissan; and

      b.  It failed to provide the disclosures required by the CLA to Plaintiffs prior to consummation of the transaction for the lease of the Nissan;

41.    For its CLA violations, Napoli Motors is liable to Plaintiffs for actual damages plus additional statutory damages of $2,000, plus attorney's fees and costs.

## B.  CONNECTICUT UNFAIR TRADE PRACTICES ACT

42.    Napoli Motors has engaged in unfair and deceptive acts and practices in violation of CUTPA as follows:

      a.  It failed to provide Plaintiffs with a Connecticut K-208 form in connection with the purchase of the Kia, a violation of Conn. Gen. Stat. § 14-62(g);

      b.  It sold the Kia to Plaintiffs in a dangerous condition;

      c.  It failed to conduct  a safety inspection as required by Conn. Gen. Stat. § 14-62(g) or, if it did, it nevertheless sold the Kia with defective brakes;

      d.  It failed to provide Plaintiffs with a repair invoice the first time that the Kia was brought in for repairs;

      e.  It made false statements regarding the condition of the Kia at the time of sale to Plaintiffs and afterwards;

      f.  It refused to perform necessary repairs to the brakes, even though the repairs were covered by the warranty, and it misrepresented the condition of the brakes in order to coerce Plaintiffs into purchasing or leasing another vehicle;

      g.  It utilized a cash price in the Lease Agreement for the Nissan that was in excess of the MSRP as shown on the Monroney sticker and by charging

the Plaintiffs considerably more than the price it had communicated to Rodriguez;

h.   It made false statements regarding the amount of the monthly payments for the Nissan, inducing Plaintiff to enter into a lease that they could not afford;

i.   If made false representations to NMAC so that it would accept assignment of the Lease Agreement even though Plaintiffs could not afford the monthly payments;

j.   It charged Plaintiffs for a service contract that they had not requested and did not desire, and that they did not know was included in the transaction for the Nissan.

43.   Napoli Motor's conduct, as aforedescribed, was deceptive and unfair and in violation of CUTPA, and it has caused Plaintiffs to suffer ascertainable losses and damages in that she lost the use of the Kia as well as the down payment that she paid for the Kia and they became obligated under a lease that they could not afford to pay.

44.   Rodriguez also suffered lost income as a consequence of not having transportation.

45.   Napoli Motors is liable to Plaintiffs for their damages, punitive damages, and a reasonable attorney's fee.

46.   NMAC is subject to these claims and to Plaintiffs' defenses under the Contract in accordance with Conn. Gen. Stat. § 42-411(b).

47.   Plaintiffs are also entitled to equitable relief in the form of an order that the Lease Agreement is rescinded and that Plaintiffs have no further liability thereunder.

C.    RESCISSION FOR FRAUD OR MATERIAL MISREPRESENTATION

48.    Napoli Motors made false representations regarding the monthly payments on the car that constitute material misrepresentation or fraud.

49.    Napoli Motors also made false representations regarding the Kia by telling Rodriguez that it was functioning as designed, even though the brakes required repair and replacement, causing her to feel unsafe driving the Kia and inducing her to enter into the Lease Agreement for the Nissan.

50.    Napoli Motors' fraudulent statements or material misrepresentations were tortious in nature and were made in bad faith, were wanton and malicious, outrageous, and were undertaken with bad motive and with a reckless indifference to Plaintiffs' interests and the injuries that they sustained.

51.    NMAC is subject to these claims and to Plaintiffs' defenses under the Contract in accordance with Conn. Gen. Stat. § 42-411(b).

52.    Plaintiffs are entitled to an order that the contract is rescinded and that Plaintiffs have no further liability thereunder.

D.  BREACH OF WARRANTY (NAPOLI MOTORS ONLY)

52.    Napoli Motors' written warranty that it would make the necessary repairs for defects within the lesser of the first 60 days or 3,000 miles of operation constituted an affirmation of fact or promise by Napoli Motors to Plaintiffs that related to the Kia and became part of the basis of the bargain, thereby creating an express warranty pursuant to Conn. Gen. Stat. § 42a-2-313 and it was a written warranty within the meaning of the MAGNUSON MOSS WARRANTY ACT.

53.     Napoli Motors breached its express warranty to Plaintiffs in that it failed to make the repairs in accordance with the written warranty despite having been provided with a reasonable opportunity to do so.

54.     For its breaches of warranty, Napoli Motors is liable to Plaintiffs for their damages pursuant to Conn. Gen. Stat. § 42a-2-714(3) plus attorney's fees and costs pursuant to 15 U.S.C. § 2310(d).

55.     Napoli Motors' breaches of warranty were tortious in nature and in bad faith and were made with a willful disregard for Plaintiffs' rights, and it is liable for common law punitive damages.

56.     Plaintiffs' total damages, including common law punitive damages, are in excess of $50,000.

WHEREFORE, the Plaintiffs claim actual damages, punitive damages, statutory damages of $2,000, attorney's fees and costs, and an order declaring the contract rescinded.

PLAINTIFFS, GLADYBELD RODRIGUEZ and GLADYS QUIRINDONGO

By: */s/Daniel S. Blinn*
Daniel S. Blinn   (ct02188)
dblinn@consumerlawgroup.com
Consumer Law Group, LLC
35 Cold Spring Rd. Suite 512
Rocky Hill, CT  06067
Tel. (860) 571-0408
Fax (860) 571-7457